**AMERICAN NATIONAL INSURANCE COMPANY, Appellant,**

v.

**Lazaro CARBAJAL, Appellee.**

**No. 1015.**

Court of Civil Appeals of Texas, Corpus Christi.

Nov. 26, 1975.

Rehearing Denied Dec. 17, 1975.

 

O. F. Jones, Victoria, for appellant.

Edward J. Ganem, Victoria, for appellee.

OPINION

NYE, Chief Justice.

This is a suit on a credit life and disability insurance policy. Suit was instituted by plaintiff Lazaro Carbajal against defendant American National Insurance Company to recover under a credit life and disability insurance policy issued to the plaintiff at the time of creation of his indebtedness. Trial was before the court without the aid of a jury. The trial court held that plaintiff was entitled to recover from defendant the sum of $821.17, plus 12% penalty of $98.54 and attorney's fees in the amount of $500.00. From this judgment appellant American National Insurance Company has duly perfected its appeal to this Court.

The plaintiff on or about November 10, 1971, purchased a piano from Hauschild's Music Company of Victoria County, Texas. He executed a note and mortgage to cover a part of the purchase price of the piano. The note was assigned to the First Victoria National Bank, where the plaintiff was to make his payments. As a part of the installment contract, the bank charged and received a premium for credit life and disability insurance on the plaintiff. Approximately seven months after the plaintiff purchased the credit life and disability insurance, he began complaining of failing vision which finally culminated in his total disability in 1973.

The insurance company appeals from the trial court's judgment contending that: 1) there was no evidence that the plaintiff became totally and permanently disabled as defined and set out by the terms of the insurance policy; and 2) that the finding (of total disability) of the trial court is against the great weight and preponderance of the evidence.

Plaintiff Lazaro Carbajal, a man of approximately 56 or 57 years of age, had a

long history of past ocular difficulties consisting of what was referred to as "a granular like kerotitis" in both eyes, together with a past history of trachoma. In 1937 at age 17, plaintiff spent four or five months at the school for the blind. His condition was at that time diagnosed as trachoma. After taking certain tests at the school for the blind, showing that he had recovered sufficiently to be able to function adequately and go back to work, he was discharged. Plaintiff then got a job with the Texas Highway Department driving a truck. He continued to drive for the Texas Highway Department for approximately the next 30 years without incurring any problems with respect to his eyes.

However, in 1968, he began incurring problems with his eyes and was referred to a Dr. Burden in San Antonio. Dr. Burden on March 19, 1968 performed a lamellar keratoplast (cornea transplant) on plaintiff's right eye. This improved his vision with a contact lens to 20/60. In January 1970, Dr. Burden performed another lamellar keratoplast on plaintiff, this time on plaintiff's left eye, resulting in his post operative vision of 20/60 minus 1. After each of these operations there was nothing to indicate that the operations were not a success and plaintiff returned to work with the Texas Highway Department.

On November 10, 1971, some 22 months after the last operation, plaintiff purchased the piano in question and entered into an installment contract with Hauschild's Music Company of Victoria, Texas. The piano was financed through the First Victoria National Bank in Victoria. The total price of the piano amounted to $1,109.11. Payments were to begin December 17, 1971, with 35 monthly installment payments of $30.50 each. Included in the total figure was a finance charge of $207.93 and a $29.78 premium for a credit life and disability insurance policy on plaintiff. Plaintiff was insured under a master policy of credit life insurance, which the defendant insurance company had issued to First Victoria National Bank, for the purpose of covering

the bank customers (debtors). The policy provided in addition to life insurance benefits to pay off the indebtedness in the event plaintiff became totally and permanently disabled while the indebtedness remained outstanding and unpaid.

The record showed that plaintiff purchased the insurance coverage from an employee of Hauschild's, a Mr. Louis Martinez. It is undisputed that plaintiff was never asked by either Mr. Martinez, the defendant American National Insurance Company, or anyone at the bank, whether he was in good health or anything with reference to his insurability. Plaintiff was not asked to or required to submit to a physical examination by either the defendant company, Hauschild's Music Company, or the bank. It is undisputed that plaintiff made no statement as to his insurability or his physical condition at the time the insurance was purchased. Mr. Martinez testified that he had never even seen a copy of the policy of insurance he sold to plaintiff. He stated that he had no actual knowledge of the terms contained therein. Martinez testified that when selling the credit life to customers, he had been told to "sort of mention to the customers that in case of death or in case of disability that the payments would be taken care of", and had told plaintiff that if he were to take out the policy of disability insurance, in the event he (plaintiff) became disabled, he would be covered. He was never instructed to determine the customers' insurability. He was only instructed to ascertain if the debtor was between the ages of 18 and 66, a requirement for eligibility. Mr. Milton Gohlke, loan officer for First Victoria National Bank, which financed the loan on the piano, testified that with respect to the credit life policy they did not require any kind of physical examination on anyone when the amount financed was under $10,000.00. The amount financed here was just a little over $1,000.00. The First Victoria National Bank was named beneficiary should the plaintiff debtor die or become disabled.

In May, 1972, approximately 7 months after plaintiff purchased the credit life and disability insurance policy, he began complaining of failing vision in his left eye. Upon an examination, it was found that blood vessels were growing between the graft performed by Dr. Burden and the cornea. The graft itself was edematous. It was then determined that another cornea transplant would be necessary. In June 1972, Dr. Burden performed another penetrating keratoplasty (cornea transplant) on plaintiff's left eye. Subsequently, complications constituting leakage of the wound due to overexertion on the part of plaintiff occurred. Plaintiff had also developed a dense cataract in the left eye. Dr. Burden then referred plaintiff to Dr. David Paton, an ophthalmologist in Houston, Texas. On June 8, 1973, Dr. Paton examined plaintiff and found that his right eye had less than 20/40 power and the left eye was sensitive to light perception only. He found that there was inflammation in both eyes caused by either the rejection reactions due to the transplant or to intraocular inflammation due to other causes. Plaintiff again on July 16, 1973 had a cornea transplant on his left eye which again proved unsuccessful.

It was undisputed that at the time plaintiff made claim under the policy, he was considered permanently disabled. In fact, the insurance company's attorney stated: "Now, for simplicity sake, there's not any question but that the man is disabled. There's not any question but that this man's disability began in 1973."

Plaintiff, being unable to continue working, timely made his claim to the defendant insurance company asserting that he was permanently disabled and entitled to have his obligation to the bank satisfied under the terms of the credit life and disability policy. The claim was denied by the defendant insurance company.

Plaintiff then brought suit against defendant contending that because of the disability he was entitled to have the defendant insurance company pay the balance due on the piano, said sum then being $821.17.

He also sought the 12% statutory penalty and reasonable attorney's fees in the amount of $500.00 for failure of the insurance company to pay the claim. Defendant answered contending that the cause of plaintiff's disability was contracted before the effective date of the policy and that, therefore, there is no liability for the particular disability of the plaintiff. Trial was before the court without the aid of a jury. The trial court found that plaintiff should recover from the defendant the sum of $821.17, plus $98.54 (12% penalty), and reasonable attorney's fees in the sum of $500.00. From that judgment, appellant has duly perfected its appeal to this Court.

■ No findings of fact or conclusions of law were requested or filed. Where findings of fact and conclusions of law were not requested or filed, the trial court's judgment should be affirmed if it can be upheld on any legal theory that finds support in the evidence. *Bishop v. Bishop,* 359 S.W.2d 869 (Tex.Sup.1962); *Life & Casualty Insurance Company of Tennessee v. Rivera,* 420 S.W.2d 788 (Tex.Civ.App.—Corpus Christi 1967, no writ).

The insurance policy in question reads in part as follows:

"If any debtor while insured under the Group Policy shall become wholly and continuously disabled, during the term specified in the individual certificate issued to such debtor, as a result of bodily injury sustained during said term and effected solely through accidental means, or as *a result of sickness contracted and commencing during said term,* and is thereby prevented from engaging in any occupation or from performing any work for compensation or profit, he shall be deemed to be totally disabled.

\*　\*　\*　\*　\*　\*

Sickness as used in this rider means a sickness or disease, not hereinafter excepted, *contracted and commencing after the effective* date of the insurance as to the debtor whose sickness is the basis of

claim and causing loss of time commencing while this order is in force as to such debtor.

Upon receipt of due notice and proof in writing from a legally qualified physician or surgeon, other than the debtor, that the debtor has become totally and permanently disabled, as defined herein, the Company will pay disability benefits each month to the creditor, to be applied by the creditor to reduce or extinguish the unpaid indebtedness of the debtor to the creditor, for the actual number of days of such permanent total disability, commencing with the ninety-first day thereof, but not to exceed the total number of days remaining until the expiration date of the insurance as specified herein; the amount of such daily indemnity to be calculated as ⅓₀th of the amount of the insured monthly installment payable by the debtor to the creditor."

The appellant American National Insurance Company argues that the cause of disability suffered by plaintiff was contracted before the effective date of the policy (November 10, 1971) and that, therefore, there is no liability under the terms of said policy for the particular disability of the plaintiff.

Appellant contends first that at the time plaintiff purchased the disability insurance policy (November 10, 1971), he had the condition which caused his ultimate disability and there was no evidence that plaintiff's sickness commenced after the effective date of the policy.

■ In seeking to determine whether there is any evidence to support the trial court's judgment, we must consider only that evidence most favorable to the trial court's implied findings (which is contrary to the insurance company's contentions) and disregard entirely that evidence which is opposed or contradictory in its nature. *Renfro Drug Co. v. Lewis,* 149 Tex. 507, 235 S.W.2d 609 (1950); *Banks v. Collins,* 152 Tex. 265, 257 S.W.2d 97 (1953). The appellant's "against the great weight and preponderance of the evidence" point requires us to review and weigh all the evidence. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

■ The circumstantial evidence as well as the direct evidence supports the trial court's judgment that the condition that caused plaintiff's disability commenced after the inception of the insurance policy. Although the plaintiff had cornea transplants in his right and left eyes in March of 1968 and January of 1970, there was no evidence that the ultimate disability that plaintiff experienced was caused by a condition that began after the cornea transplants. In fact, plaintiff went to work after the operations and worked driving a truck continuously for 22 months until he purchased the policy of insurance in 1971. The evidence shows that it was 7 months after he purchased the policy before he started having trouble with his eyes that led to his ultimate disability in 1973.

In addition, there was direct and positive evidence that his condition commenced after the policy became effective. Dr. Burden found that in May of 1972 that: "There was some blood vessels growing between the graft and his cornea". On another occasion, Dr. Burden testified that he performed another cornea transplant which was "sutured in place". The doctor testified that due to some "overactivity he (the plaintiff) developed problems". "He continued to do well until October, when he came back with a history of the left eye being irritable". There was no evidence that the cause of plaintiff's disability commenced prior to the inception of the insurance policy in question. After reviewing this and the entire record, we find ample evidence to support the trial court's findings that the plaintiff's disability was a result of sickness that was contracted and which commenced during the term of the policy. Appellant's first point is overruled.

■ A certificate evidencing group insurance coverage on plaintiff appears in the record with disability coverage becoming

effective on November 10, 1971. There is no dispute that the premium on said policy was paid and accepted by the defendant insurance company. The record conclusively shows that the plaintiff had suffered no disability prior to or at the time the disability coverage became effective in November of 1971. It was only in May of 1972 that plaintiff began having vision difficulties after his last eye operation some two and one-half (2½) years later. The insurance company's attorney admits that plaintiff was totally disabled and that such disability began in 1973. The plaintiff therefore established a prima facie case for recovery under the terms of the policy of insurance that was in existence. It was then the appellant insurance company's burden to come forward and prove that an exclusion in the policy was applicable that would prevent plaintiff from recovering on the policy in question. This the appellant insurance company failed to do.

Considering appellant's greater weight and preponderance evidence point, we have considered all of the evidence in the record. There was evidence that plaintiff's disability was due to the rejection of the cornea transplant and the failure of the subsequent attempts at cornea transplants. There was evidence that showed that although the plaintiff had eye problems that resulted in cornea transplants originally in March of 1968 and January of 1970, plaintiff immediately went back to work and was working at the time the disability insurance became effective. There was no evidence that the past operations (March of 1968 and/or January of 1970) were unsuccessful or that his body was rejecting the transplants at any time from the date of the operation until his disability some three to five years later.

After considering all of the evidence, we find that the evidence was sufficient to support the trial court's judgment and that such judgment was not against the great weight and preponderance of all of the evidence. Appellant's second point is likewise overruled.

The judgment of the trial court is affirmed.